**McDONALD'S CORPORATION, Plaintiff,**

v.

**McBAGEL'S, INC. and Ken McShea, Defendants.**

**No. 85 Civ. 7868 (JMW).**

United States District Court, S.D. New York.

Dec. 10, 1986.

Robert E. Wagner, Wallenstein, Wagner, Hattis, Strampel & Aubel, Chicago, Ill., Joseph D. Garnon, Brumbaugh, Graves, Donohue & Raymond, New York City, John R. Horwitz, Sr. Corporate Atty., Oak Brook, Ill., for plaintiff.

Lawrence S. Lawrence, Yvonne Cort, Lawrence, Ciovacco and Walsh P.C., Hempstead, N.Y., for defendants.

## OPINION

WALKER, District Judge:

Plaintiff McDonald's Corporation ("McDonald's") brings this action to enjoin the Defendants McBagel's, Inc. ("McBagel's") and its sole shareholder Ken McShea ("McShea") from using the name "McBAGEL'S" in connection with a bagel bakery and restaurant located in Fishkill, New York. McDonald's claims that defendants are violating both statutory and common law, and asserts causes of action for trademark infringement under 15 U.S.C. § 1114(1)(a); unfair competition under 15 U.S.C. § 1125(a); common law unfair competition; and dilution under New York General Business Law § 368-d (McKinney 1984).[1]

The Court reaches these findings of fact and conclusions of law following a careful review of the testimony offered by both sides at a bench trial, as well as a word-by-word reading of the trial transcript, the Court's trial notes, the depositions and exhibits received in evidence, and the extensive pre-trial and post-trial submissions of the parties.

### The Parties

#### McDonald's and Its Business

McDonald's, a Delaware Corporation with its principal place of business in Oak Brook, Illinois, is perhaps the largest fast food chain in the United States. Since its

---

1. The jurisdiction of this Court is grounded in 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

founding in the mid–1950's, McDonald's has grown steadily.

In 1955, Ray A. Kroc opened a single restaurant in Des Plaines, Illinois, a suburb of Chicago. Kroc originally licensed the right to use the name and mark "Mc-DONALD'S" from Richard and Maurice McDonald, who had operated a restaurant under that name in San Bernadino, California. A few years later, Kroc paid the McDonald brothers several million dollars, purchasing rights to use the name "Mc-DONALD'S" throughout the United States. During the past 30 years, McDonald's has expanded to include more than 9,000 restaurants throughout the world, 6,800 of which are located in the United States. In 1984, the company's revenues exceeded $2.5 billion.

McDonald's opened its first New York State restaurant in 1958, and since that time has established several hundred restaurants in New York. One of these is located in Fishkill, about one mile from the McBagel's bagel bakery and restaurant. The Fishkill McDonald's, like about 75 percent of McDonald's restaurants, is operated as an independent franchise and staffed by local residents.

In 1955, McDonald's original menu consisted of hamburgers, french fries, and milkshakes. Subsequently, McDonald's has experimented with, tested, and sold a wide variety of products in various stores throughout its system. For instance, in 1968, after market testing in California, McDonald's introduced a breakfast sandwich called the "EGG McMUFFIN" in restaurants across the United States. In 1979, McDonald's first experimented with a chicken dish called "CHICKEN McNUGGETS." These "McNuggets" are now served at most McDonald's restaurants.

Today, McDonald's restaurants offer a substantially uniform menu, including hamburgers, cheeseburgers, special sandwiches, french fried potatoes, chicken nuggets, fried fish sandwiches, shakes, hot pies, sundaes, cookies, soft drinks, and other beverages. Most McDonald's restaurants operating in the United States and Canada are also open during breakfast hours with a breakfast menu that includes the "EGG McMUFFIN" and "McMUFFIN" sandwiches, pancakes, and other breakfast fare. Still interested in expanding the range of food items available in McDonald's stores, the company frequently test markets new items and licensees often participate in or initiate such testing.

McDonald's has made a point of identifying each new product or service with the "Mc" or "Mac" prefix. Although McDonald's holds no trade or service mark registration for the "Mc" prefix standing alone, it has registered some thirty-four marks which contain "Mc" or "Mac". These registered marks represent a variety of food items and services.[2]

### McDonald's Advertising Efforts

McDonald's originally advertised only its name "McDONALD'S" and its well-known "ARCHES" trademark. In recent years, however, it has expanded this advertising to include other distinctive marks, which are derived from "McDONALD'S" and begin with "Mc" or use "Mac", such as "EGG McMUFFIN", "SAUSAGE McMUFFIN", "McD.L.T.", "BIG MAC", "RONALD McDONALD", and CHICKEN McNUGGETS". Today, all advertisements contain the mark "McDONALD'S" and the "ARCHES", and most include at least one of these specific products designated by the "Mc" or "Mac" formative.

---

2. The following list includes McDonald's registered marks representing food items (f) and services (s): McDONALD'S (s); McDONALD'S HAMBURGERS (s); McDONALD'S (f); RONALD McDONALD (s); McDONALDLAND (s); McCHEESE & DESIGN (f); EGG McMUFFIN (s); EGG McMUFFIN (f); McDONALDLAND (f); McDONALD'S & ARCHES (s); McFEAST (f); McCHICKEN (f); McDONALD'S & ARCHES (f); McDONUTS (f); McPIZZA (f); BIG MAC (f); McPIZZA (s); McHAPPY DAY (s); MINI MAC (s); McDOUBLE (f); TOGETHER–McDONALD'S & YOU (s); CHICKEN McNUGGETS (f); McDONALD'S & YOU (s); SUPER MAC (f); McSNACK (s); MAC FRIES (f); McRIB (f); MAPLE McCRISP (f); LITE MAC (f); BIG MAC (s); CHICKEN McSWISS (f); McMUFFIN (f); McD.L.T. (f).

McDonald's makes substantial investments in advertising and marketing the products designated by its trademarks and service marks. In fiscal year 1984, McDonald's and its licensees spent over $300 million in national and local television, radio, newspaper, magazine, billboard, and other advertising. In 1985, the McDonald's system increased its advertising expenditures to $350 million. In that year, in addition to its general advertising expenses, McDonald's spent $125 million on in-store promotions.

About ninety percent of this large annual advertising budget is used solely for television commercials. The Court received in evidence numerous storyboards proposed for McDonald's local and national television commercials, which usually run for from four to six weeks. As of the trial of this action, McDonald's was the nation's largest advertiser of any single good, service, or establishment, and the nation's fifth largest advertiser overall.

### McBagel's, Its Business and Advertising

McBagel's, owned by defendant and sole shareholder Ken McShea, was incorporated in the State of New York in August of 1984. After completing construction in December 1984, McBagel's opened its bagel bakery and restaurant in a Fishkill, New York shopping center under the name "McBAGEL'S".

Since its opening, McBagel's primarily has sold a variety of bagels baked each day on the premises. McBagel's menu includes bagels, salads, sandwich fillers such as egg salad, tuna fish, chicken salad, shrimp salad, as well as a wide variety of hot and cold sandwich meats. The restaurant also serves soft drinks, soup and breakfast items, such as eggs, buttered bagels, egg & ham on a bagel, and traditional breakfast beverages. The name "McBAGEL'S" appears on a neon sign reading "McBagel's Bagel Bakery & Restaurant", which defendants have placed above the entrance to the store, and on cardboard signs serving as menus, which are located inside the restaurant. McBagel's has an advertising budget of between $10,000 and $15,000 a year, and has used "McBAGEL's" in flyers and coupons, weekly newspaper advertising, telephone directory ads and regularly-broadcast radio commercials. In the year prior to trial, McBagel's also received some free advertising from the coverage by various local newspapers, WCBS–TV in New York and INN News, of the instant dispute between McDonald's and McBagel's.

### The Parties' Contentions

Plaintiff McDonald's objects to the defendants use of the "Mc" prefix in conjunction with a generic food item, the bagel, to denote McBagel's services as a bagel bakery and restaurant. McDonald's first voiced it opposition to the restaurant's name in December 1984, and subsequently filed this action in October 1985. The essence of plaintiff's claim is that defendants' use of the phrase "McBAGEL'S" creates confusion among customers as to whether McDonald's somehow sponsors or is otherwise associated with McBagel's.

McDonald's, however, has limited the scope of the trademark protection it requests in this action. McDonald's expressly stated at trial that it had no complaint with defendants' use of the "Mc" prefix in conjunction with a word unrelated to food products. Thus plaintiff would not have objected had defendants called the bakery and restaurant "McSheagels," the name selected by the public, but never adopted by defendants, in a name contest run by defendants after they first learned of McDonald's opposition to their use of the name McBagel's.

McBagel's, on the other hand, broadly asserts that McDonald's extensive advertising program actually eliminates any possibility of confusion with McBagel's, since the McDonald's marks and every aspect of its distinctive business, including McDonald's unique restaurants and their golden arches, are so well known.

### The Mark Which McDonald's Seeks To Protect

The mark for which McDonald's claims protection is the prefix or formative "Mc"

when used with a generic food item, as in the numerous marks already registered by plaintiff. *See* Note 2 *supra.* While it does not hold a registered mark in "Mc", plaintiff may claim protection for this prefix as a common component of a "family of marks." 3A R. Callman, *The Law of Unfair Competition Trademarks and Monopolies* § 20.24 (4th ed. 1986) [hereinafter cited as Callman]. In other words, if McDonald's can demonstrate that it has established a "family of marks", the corporation may obtain trademark protection against one whose mark is thought to emanate from the same source as the plaintiff's family.

■ The existence *vel non* of a family of marks is a question of fact based on the distinctiveness of the common formative component and other factors, including the extent of the family's use, advertising, promotion, and its inclusion in a number of registered and unregistered marks owned by a single party. In this case, the Court has no hestitation in finding that McDonald's owns a "family of marks", both registered and unregistered, whose common characteristic is the use of "Mc" or "Mac" as a formative. The existence of this family is evidenced by the mark registrations noted above, as well as by credible testimony as to the massive advertising expenditures devoted by McDonald's to create recognition for marks beginning with "Mc" or using "Mac". Such marks include "MAYOR McCHEESE" "EGG McMUFFIN", "McCHICKEN", "McHAPPY DAY", "MINI MAC", "CHICKEN McNUGGETS", "McSNACK", "McMUFFIN" and "McD.L.T." The Court received in evidence more than one hundred McDonald's storyboards of television commercials, run nationally and locally between 1975 and 1986, a majority of which promoted one or more members of the "Mc" family of marks. In 1976, television commercials were aired that created an entire "Mc" language, using words such as "McFriendliest", "McGreatest", "McCleanest", "McClown", "McFavorite", in a campaign promoting the clown Ronald McDonald as McDonald's symbol. The Court

also received evidence of extensive print advertising in national magazines, such as Time, Newsweek, and Sports Illustrated: billboard advertising, and promotional materials used in MacDonald's 6,800 United States outlets, all of which promoted the "Mc" formative.

In addition, the Court finds that there is substantial news media use of the "Mc" language in independently created articles about McDonald's. For example, a 1982 news article in Chicago describing a wedding held at a McDonald's restaurant is entitled: "Here Comes McBride." A nationally-syndicated political cartoon depicted President Reagan in front of a "McRonald's" sign on plaintiff's golden arches, posting the number 10 next to the words "million unemployed." Indeed, a news article about this very case was entitled "McDonald's McMakes Trouble for McBagels."

Finally, there is substantial evidence, credited by this Court, that McDonald's has actively policed its rights in the "Mc" formative prior to defendant's use of the mark "McBagel's." Many agreements between McDonald's and other prospective "Mc" users, as well as a number of court or administrative orders, have resulted in prohibitions against the use of "Mc" formative marks, the assignment of marks using this formative to McDonald's, and other limitations on outside use of this formative.

Upon the totality of the record, it is clear that the "Mc" formative has been extensively used, promoted widely at great expense, made the subject of numerous federal registrations, and actively policed. McDonald's is thus able to use the family of marks denoted by the "Mc" formative as a basis for its trademark enforcement action in this case. *See AMF, Inc. v. American Leisure Products, Inc.,* 474 F.2d 1403 (CCPA 1973) (finding a family of marks based on the formative "FISH" for names of boats as in "SAIL FISH" and "SUNFISH"); *Dictaphone Corp. v. Dictamatic Corp.,* 199 U.S.P.Q. 437 (D.Or.1978) (upholding a family of marks prefixed by the phrase "Dicta").

## I. TRADEMARK INFRINGEMENT

Under the Lanham Act, Section 32(1)(a), 15 U.S.C. § 1114(1)(a); as well as Section 43(a), 15 U.S.C. § 1125(a), defendants are liable for infringement if their use of the name McBagel's is likely "to cause confusion, or to cause mistake or to deceive" typical consumers into believing some sponsorship, association, affiliation, connection or endorsement exists between McDonald's and defendants.

There is no precise formula for identifying the circumstances under which a trademark owner may enjoin a defendant's use of a similar mark on different products. The interests, however, which justify trademark protection in situations where plaintiff and defendant advertise non-identical products under similar names provide the framework for analyzing these problems. The three interests which justify this trademark protection are:

> [F]irst, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks....

*Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976).

In protecting these interests the consideration which the courts have repeatedly emphasized is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir.1979); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978). McDonald's need prove by only a preponderance of the evidence that a likelihood of confusion exists. J.T. McCarthy, *Trademarks and Unfair Competition,* § 23:20, at 105 (2d ed. 1985) [hereinafter cited as McCarthy].

Moreover, it is clearly established in the Second Circuit that likelihood of confusion refers to confusion *of any type, Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566 (2d Cir.1971), including confusion of source, sponsorship, affiliation, connection, or identification. *King Research, Inc. v. Shulton, Inc.,* 324 F.Supp. 631 (S.D.N.Y.1971), *aff'd,* 454 F.2d 66 (2d Cir.1972); McCarthy, *supra,* § 24:3(b) at 166. As the Court of Appeals stated in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204 (2d Cir.1979):

> In order to be confused a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.

In reaching a conclusion as to whether a likelihood of confusion exists, a court must consider and weigh numerous equitable factors. The late Judge Friendly set forth a total of nine criteria for making this evaluation. In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), he identified eight of these considerations:

> [T]he strength of his [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

In the later case of *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir.1964) he added a ninth factor: the relative harm to the parties should the court grant or deny the relief requested.

In this case, McDonald's has cited advertising employed by defendants to attract customers to McBagel's as the cause of actual or potential confusion suffered by consumers. Plaintiff contends that the harm to it occurs when the hungry customer seeking a quick meal is drawn to McBa-

gel's after seeing the name in the paper or hearing it on the radio and associating it, however fleetingly, with plaintiff's goods, services, sponsorship, or other support. With the issue thus presented, the Court must also consider whether a likelihood of confusion exists in light of the advertising efforts employed by the two companies.

### Strength of the Mark

The first consideration to address is the strength of McDonald's mark "Mc". The strength of a mark is a function of its distinctiveness, or its tendency to identify the goods or services sold under the mark with a particular source. *McGregor, Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Arbitrary and fanciful marks which are non-descriptive and non-generic are by their nature stronger trademarks because they are easily identified solely with a particular product or service. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F.Supp. 735 (S.D.N.Y. 1985); *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1197 (S.D.N.Y.1979), *aff'd mem.*, 636 F.2d 1203 (2d Cir.1980). The category of such non-generic, non-descriptive marks includes marks like "DIAL," "SANKA," and "PEPSI." When these marks are registered, they are accorded the highest degree of protection. *Lois Sportswear, USA, Inc., supra.*

The defendants argue that the family of marks for which McDonald's seeks protection is weak because the marks, consisting of the "Mc" formative attached to food items such as pizza, chicken, and muffins, "fall into the category of generic, or at most descriptive" marks (Def.Br.P. 3). The Court disagrees. The "Mc" formative, standing alone, is arbitrary and fanciful and describes nothing. It does not lose that characteristic when added to a generic food term.

McDonald's massive advertising efforts and its determined promotion of marks using the "Mc" prefix also has enhanced the distinctiveness of the McDonald's family of marks. As found above, this advertising has resulted in the development of a "Mc" language by which plaintiff has become known. The strength of McDonald's marks is further established by a lengthy record of judgments, consent decrees, and agreements which prevent competitors from using the "Mc" formative. These court orders and agreements evidence a general recognition in the business community that the "Mc" formative stands as a symbol of McDonald's services and products. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669 (Fed. Cir.1984).

Finally, a survey conducted on plaintiff's behalf, which the Court credits, provides additional evidence of the strength of the "Mc" mark. A number of people who responded to the survey questionnaire believed that McDonald's sponsored or promoted McBagel's. When asked why they made this association 58 percent nationally and 68.8 percent in New York State gave as their reason the use of the "Mc" formative in the name McBagels.

Although the defendants introduced some evidence as proof of the weakness of the "Mc" family of marks, this Court attaches little weight to it. Defendants' evidence consists of the existence of third party registrations of "Mc" or words prefixed by "Mc." *AMF, Inc., supra.* Although weakness of a family marks might be shown by use or promotion of the same mark by third parties, or by evidence that consumers identify the mark with products other than those of the owner seeking protection, the Court finds that defendants have produced no such evidence here. Mere registrations, by themselves, prove neither actual use of any of the marks registered by competitors, nor the degree of competitors' promotion of their marks through advertising. Finally and most importantly, there is no evidence before this Court that consumers recognize such marks and identify them with a specific product that is not sponsored by McDonald's. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976); *Beneficial Corp. v. Beneficial*

*Capital Corp.*, 529 F.Supp. 445 (S.D.N.Y. 1982).

In sum, the Court finds that defendant has established the strength of the "Mc" family of marks.

### Similarity Between the Two Marks

Although defendants seem to agree that the name "McBAGEL'S", taken in isolation, is similar to plaintiff's family of marks, they argue that similarity must be considered in the context in which the public becomes aware of the marks. Thus, it is argued, McDonald's advertising always uses the "Mc" formative together with other distinctive McDonald's marks, usually the name "McDONALD'S" together with the "ARCHES" that stand in front of the McDonald's restaurants. According to the defendants, this means that McDonald's advertising is dissimilar from McBagel's because McBagel's does not use any of these distinctive marks in its advertising. Also, defendants argue that they publicize the slogan "MCBAGEL'S" in ways that distinguish the two companies. The defendants advertise McBagel's three ways: in print, together with the term "Bagel Bakery and Restaurant"; on the radio, without any allusion to McDonald's; and at the restaurant's premises, which are different in design than McDonald's restaurants. Taken together, defendants assert, the distinctions between the two marks as advertised eliminates any possible similarity arising from the simultaneous use of "Mc" by McDonald's and McBagel's.

While some of these differences do exist, the Court is of the view that the balance on this point tips toward similarity and away from dissimilarity. Contrary to defendants' assertions, any distinctions between defendants' mark and plaintiff's family of marks are, in fact, considerably reduced by the style of defendants' advertising. First, in all of defendants' print advertising, the mark "McBAGEL'S" is featured prominently and in larger print than the word "Bagel Bakery and Restaurant", and nothing printed eliminates the possibility that McDonald's does not sponsor the bagel establishment. Second, defendants' radio advertising features the name "McBAGEL'S" without any emphasis on the bagel bakery. This advertising technique highlights the restaurant services, many of which McDonald's offers as well, and so any possible distinctions between the two marks as advertised become insignificant.

The Court also notes that the advertising mediums used by the parties are similar as are the cross-sections of the public reached by this advertising. Where advertising methods and the market targeted by two parties are different, there is less likelihood of consumer confusion. But in this case, both McDonald's and McBagel's use radio and print advertising, and both reach the same market in the Fishkill area. Neither directs its advertising to a different portion of the Fishkill population. Instead, both look to a market that includes, as one of plaintiff's witnesses testified, "anyone with a stomach."

While there are differences in restaurant trade dress, these differences in physical appearance, atmosphere and style of the restaurant establishments do not dispel any possible association between the two companies. McDonald's has both a history of expanding into new services and products and has restaurants that, like McBagel's, are not independent structures but instead are located in malls or buildings side-by-side with other retail establishments. Nor does the fact that McBagel's does not use other distinctive McDonald's marks, such as the golden arches, detract from the similarity between the two marks. The McBagel's customer could mistakenly believe that McDonald's has just entered the bagel market under a slightly different name and style.

Finally, McBagel's emphasis on trade dress distinctions misses the point that once confusing advertising has drawn the customer to McBagel's restaurant, he is more likely to make a purchase decision at McBagel's, whether or not trade dress distinctions at the restaurant appear, than if he had not been subjected to the advertising in the first place.

### The Proximity of the Products

Defendants argue at length that because McBagel's is a bagel bakery as well as a restaurant, and because many of the food items sold at McBagel's are not sold at McDonald's restaurants, the products covered by the parties' marks are different. This argument founders on two separate grounds.

First, the McBagel's mark denotes restaurant services, albeit in addition to the bagel bakery, and it is these services that McDonald's also provides.[3] The fact that these services are not precisely the same is immaterial. Indeed it is because defendant's services may be somewhat different, and possibly (but not necessarily) inferior to those offered by plaintiff, that protection from likely confusion is available to the plaintiff.

Second, even if the Court were to accept the contention that the defendants' services are different but closely related to services offered by plaintiff, McDonald's is nevertheless entitled to protection. In *Yale Electric Corp. v. Robertson,* 26 F.2d 972 (2d Cir.1928), Judge Learned Hand wrote:

> However, it has of recent years been recognized that a merchant may have sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owners reputation, whose quality no longer lies within his control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrowers use is so foreign to the owners as to insure against any identification of the two, it is unlawful.... The disparity in quality between such wares and anything the ... [junior user] makes no

longer counts.... The ... [senior user] need not permit another to attach to its good will the consequences of trade methods not its own.

*Id.* at 974.

More recently, in *King Research, Inc. v. Schulton, Inc.,* 324 F.Supp. 631, 637 (S.D. N.Y.1971), *aff'd,* 454 F.2d 66 (2d Cir.1972), this Court held that:

> [T]he protection which the law affords to a mark holder is not confined to goods which have a strict functional interchangeability because the zone of protection may reach into the area of noncompeting goods.... [P]rotection extends to products which may be reasonably thought to originate from the same source.

*See also Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565 (Fed.Cir. 1983) (supermarket and fast food restaurant services sufficiently proximate).

Thus a trademark owner is entitled to protection against the use of its mark not only on the particular product it markets, but also on a closely related product that consumers could reasonably believe is manufactured or sponsored by the first user. Even if McBagel's services are not exactly the same as McDonald's, the parties' businesses are so closely related, particularly given McDonald's history of expanding the range of its services, that any consumer could reasonably think that McDonald's sponsors McBagel's. The Court, therefore, finds that the products or services sold by McBagel's and McDonald's are sufficiently proximate to weigh heavily in favor of trademark protection for McDonald's and against McBagel's use of the "Mc" mark.

### The Likelihood That McDonald's Will Bridge the Gap

As indicated above, there is a substantial common element in the services offered by both parties. Each sells food for take-out and for on-premises consumption. More-

---

**3.** At trial, defendants admitted "McBagel's is used as the name of a restaurant ... and that is a service mark used in the trademark context" (T. 142).

over, to the extent that differences in the services offered do exist, substantial probative evidence established that McDonald's has an ongoing program to test new products, and has even sold bagels under this program. Thus, there is a distinct possibility that McDonald's will expand its product line to include bagels.

### Actual Confusion

Although evidence of actual confusion is not essential to proving likelihood of confusion, *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656 (2d Cir.1970); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097 (2d Cir.1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970), any evidence of actual confusion is, of course, highly persuasive in proving the existence of its likelihood. This Court finds, upon considering the evidence, that substantial actual confusion has occurred.

McDonald's Fishkill area supervisor credibly testified that on several occasions he received inquiries as to whether McDonald's was going into the bagel business. While defendants argue that these inquiries may have been in jest, the fact that they occurred at all strongly suggests that a common association between plaintiff's and defendant's marks was established in the minds of the persons making inquiries.

Plaintiff also presented survey evidence. The survey, conducted over the phone, was in two parts. One obtained a national response and the other obtained a response in New York state. The survey was conducted randomly and included 504 person nationally and 500 in New York.

After establishing the age group of the respondent, the surveyor asked the following questions:

2. Have you ever seen or heard of a restaurant called McBagel's?

3A. Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes McBagel's?

3B. What makes you think so?

4A. What products or services, if any, do you believe are sponsored or promoted by the same concern that sponsors or promotes McBagel's?

If the answer to 4A was an unspecified fast food chain or the like, the follow-up question was:

4B. Which specific (answer to 4A) are you thinking of?

The survey concluded by asking whether the respondent had eaten out at a restaurant in the past 6 months (Question 5) and whether the respondent was male or female (Question 6).

The results showed that when asked these questions a significant number of respondents associated McBagel's with McDonald's. The survey's "Key Findings" were as follows:

> Overall, nearly one out of four people (24.8 percent) in the total U.S. sample and better than one out of three people (36.4 percent) in the New York State sample believes that McBagel's is sponsored or promoted by McDonald's.
>
> > Among those people in each of the samples who report eating at a restaurant during the six months prior to the interview, the percentages believing McBagel's is sponsored or promoted by McDonald's are similar (26.0 percent and 37.3 percent respectively).
> >
> > If this study were repeated one hundred times, 95 times out of 100 we would expect the results to be within 5 percentage points of these figures.

The major reason cited for believing McDonald's sponsors or promotes McBagel's is the use of the "Mc" in the name. This reason is given by nearly six out of ten of the respondents (58 percent) in the U.S. sample and approximately 7 out of 10 (68.8 percent) in the New York sample. This indicates that a significant proportion of people appear to believe that the "Mc" as a part of the name indicates sponsorship or promotion by McDonald's.

Defendants have attacked this survey as ignoring market conditions, since it failed to include a reference to defendant's "bagel bakery restaurant" as advertised in

print with the name "McBAGEL's", or to the different typeface defendants use in print advertising. Defendants further argue that the universe of survey respondents was too broad, and that the survey was biased both because some respondents could have worked for McDonald's and because Questions 3A and 4A were leading.

While plaintiff could have conducted its survey more carefully, this Court disagrees with defendants' assertion that the survey is entitled to no weight. Although the survey did not replicate the parties' print advertising, by soliciting audio responses it was closely related to the radio advertising involved in the case. The breadth of the survey was adequately controlled by the question whether the respondent had eaten at a restaurant in the past six months. The fact that one or more survey respondents might have worked for McDonald's is not significant, since this factor would be at least as likely to work in favor of the defendants' and, in any event, is likely to be statistically *de minimis*. Finally, the leading questions in 3A or 4A do not fatally infect the survey. It was not unfair to hypothesize a larger entity's sponsorship of defendant's restaurant to determine whether an association with McDonald's was triggered by the name "McBAGEL'S". A similar question was approved in *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976).

Thus, this Court finds that in this case both direct and survey evidence of actual confusion, while not conclusive on the issue of likelihood of confusion, is substantial and probative.

### Defendant's Good Faith

This Court is persuaded by McDonald's showing that defendants have acted in less than good faith in using the "McBAGEL'S" mark. At trial McShea testified that the McBagel's name was suggested by his sister in July, 1984, stating: "She said why don't you use McBagel's with the Mc, meaning Irish, with the bagels as an ethnic food to sort of like separate it." McShea

further stated that he never had McDonald's in mind: "[T]here was nothing with McDonald's at all." The Court finds this scenario, uncorroborated as it was by McShea's sister, implausible and, after observing McShea on the witness stand, discredits it.

On October 2, 1984, following the incorporation of McBagels and while the restaurant was under construction but before its opening, McDonald's notified McBagel's of its position. For about six months after McBagel's December, 1984 opening, McShea apparently did not resist McDonald's. In a June, 1985 radio broadcast, McBagel's announced that it would run a name change contest "due to pressure from a McMajor fast food chain."

In August 1985, however, defendants' attorney notified McDonald's that defendant would not change the establishment's name since the "store has recently received much favorable notoriety in the local papers and on network television." The attorney was referring to July 1985 television and print publicity over defendants' use of the "Mc" formative, McDonald's policing efforts and McBagel's name change contest. Moreover, the Court notes that in defendants' print advertisements in October and November, 1985, a year after McDonald's first complained about McBagel's use of the "Mc" formative, several months after the name contest and even after the filing of this action, on October 7, 1985, McBagel's advertised a new food item—the "Mc (stuffed) Bagel."

The foregoing facts do not place the defendants' conduct in a favorable light. The Court concludes that the defendants first accepted McDonald's position but decided to exploit the publicity generated by this dispute, and finally, after receiving full notice of plaintiff's concerns, deliberately decided to use the "Mc" formative in advertising a product, the "Mc (stuffed) Bagel," *in addition to* continuing to use the name "McBAGEL'S." There is no justification for defendant's repeated print advertisements for the "Mc (stuffed) Bagel", and

the Court concludes that in publishing these advertisements defendants acted in bad faith.

### The Quality of Defendants' Product

█ "This factor reflects the law's recognition that a prior owner should not be subjected to the risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1202 (S.D. N.Y.1979), *aff'd mem.*, 636 F.2d 1203 (2d Cir.1980). However, product quality is not an essential element of the plaintiff's case, since plaintiff is entitled to the protection of his mark from all infringing users, regardless of the quality of the second user's product or service. As Judge Learned Hand wrote in *Yale Electric v. Robertson, supra:*

> "[I]t has come to be recognized that, unless the borrowers use is so foreign to the owners as to ensure against any identification of the two, it is unlawful.... The disparity in quality between such wares and anything the ... [junior user] makes no longer counts.... The ... [senior user] need not permit another to attach to its good will the consequences of trade methods not its own."

26 F.2d at 974.

While the parties dispute the superiority of each other's products and services, the Court need not resolve this question. Even if defendants had achieved superiority, the plaintiff is entitled to prevent them from using its mark, since to conclude otherwise would subject it to the "risk that the public's perception of his product will suffer" by defendants' suggested comparison.

### The Sophistication of Buyers

It is clear that the likelihood of confusion is increased where buyers are unsophisticated or make their purchasing decisions quickly and casually. *See King Research v. Shulton, Inc.*, 324 F.Supp. 631 (S.D.N.Y. 1971), *aff'd*, 454 F.2d 66 (2d Cir.1972); *Stix Products, Inc. v. United Merchants and Manufacturers, Inc.*, 295 F.Supp. 479, 494

(S.D.N.Y.1968). In this case, both McDonald's and McBagel's cater to purchasers of fast food or other inexpensive restaurant services. Consumers in this market do not make sophisticated restaurant choices; they make these decisions quickly and casually. Under such circumstances, there is a greater likelihood of confusion between similar trademarks than would be the case if the goods or services were expensive or required buyer sophistication.

### Conclusion as to Likelihood of Confusion

After considering all of the factors in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), and after a careful evaluation of all the evidence, this Court concludes that plaintiff has made a clear showing that a sufficient likelihood of confusion exists to warrant the injunction requested.

### Balancing of the Hardships

█ This is not a case where an injunction will unfairly disadvantage a second user who has expended considerable sums to promote his trademark before the first user raised the issue of infringement. Here, McBagel's and McShea were on notice, even before the restaurant opened, and certainly before the expenditure of significant promotional sums, that McDonald's objected to the use of the name "McBAGEL'S." Any subsequent investment was made with knowledge that use of the name "McBAGEL'S" might have to be discontinued. Accordingly, defendants are in no position to complain of any hardship caused by the injunction. *Compare Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 (2d Cir.1964).

## II. COMMON LAW UNFAIR COMPETITION

█ Recent New York cases have contained relatively little discussion of the contours of common law unfair competition in the advertising context—perhaps because the prerequisites for such an action closely

parallel an action under the Lanham Act. *See Vitabiotics, Ltd. v. Krupka, C.T.R.*, 606 F.Supp. 779, 784 (E.D.N.Y.1984). The single most important element of a state law unfair competition action is a showing that the defendant's conduct will result in consumers confusing the source of defendant's products. *Perfect Fit Industries, Inc. v. ACME Quilting Co.*, 618 F.2d 950, 953 (2d Cir.1980); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781–82 (2d Cir.1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965).

■ As discussed above, plaintiff has made a strong showing that defendants' use of the name "McBAGEL'S" has resulted in a likelihood of consumer confusion. Plaintiff's survey shows an inaccurate consumer perception that defendant was somehow associated with plaintiff. The similar advertising mediums used by the parties, as well as the similar services offered, also support plaintiff's argument that defendant's continued use of the name "McBA-GEL'S" will likely result in consumer confusion under New York state law. Finally, the facial similarity between the name "McBAGEL'S" and plaintiff's family of marks, in and of itself, supports a finding of likely consumer confusion. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950 (2d Cir.1980) (defendant's marketing of a mattress cover under the name "Bed-Mate" supported issuance of an injunction under New York unfair competition law, where plaintiff had previously marketed a similar product under the name "BedSack").

## III. DILUTION

Under New York state law, a plaintiff may receive injunctive relief without showing confusion as to source where a defendant's conduct poses "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name...." N.Y.Gen.Bus. § 368–d (McKinney 1984). "'Dilution' in this context refers to a loss of distinctiveness, a weakening of a mark's propensity to bring to mind particular product, service, or source of

either." *Stop the Olympic Prison v. U.S. Olympic Committee*, 489 F.Supp. 1112, 1123 (S.D.N.Y.1980).

■ Three factors are of central importance to a claim of trademark dilution. First, "In order to ensure protection and to mount a successful claim under § 368–d, a plaintiff must first have a trademark or name which is 'truly of *distinctive* quality' or one which has 'acquired a secondary meaning in the mind of the public.'" *Miss Universe v. Patricelli*, 753 F.2d 235, 238 (2d Cir.1985) (quoting in part *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)). Second, plaintiff must show that the similarity between its mark and the defendant's slogan or mark results in a "'whittling down' of the identity or reputation of a trademark or mark." *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983). A third relevant, although not dispositive, factor is whether or not the junior user acted with "predatory intent." *Sally Gee, Inc. v. Myra Hogan, Inc., supra*, 699 F.2d at 626.

As discussed above, plaintiff has demonstrated that its family of marks, comprised of the formative "Mc" attached to a good or service, is unquestionably distinctive. This distinctiveness has resulted in a consumer association of the "Mc" mark with plaintiff's restaurants. *See P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F.Supp. 662, 672 (S.D.N.Y.1985) ("In essence, distinctiveness in the antidilution realm may be evaluated in much the same way as strength of the mark is evaluated in the area of likelihood of confusion."). The appearance of independently-authored newspaper reports referring to plaintiff's business through use of the "Mc" prefix, the presence of settlement agreements and legal orders prohibiting competitors from using this prefix, and plaintiff's survey indicating consumer identification of this prefix with McDonald's restaurants all demonstrate the distinctiveness of plaintiff's mark.

The similar element that associates defendants' name with plaintiff's family of marks, the use of the "Mc" prefix with the name of a generic food item, is immediately apparent. New York courts have not hesitated to find "whittling down" of the identity of the trademark where slogans used by two parties bear such a facial similarity. *See, e.g., American Optical Corp. v. North American Optical Corp.*, 489 F.Supp. 443 (N.D.N.Y.1979) (granting Plaintiff American Optical an injunction against defendant's use of trade name "NORTH AMERICAN OPTICAL"); *Textron, Inc. v. Spi-Dell Watch & Jewelry Co.*, 283 F.Supp. 920 (S.D.N.Y.1968), *aff'd in part, rev'd in part on other grounds*, 406 F.2d 544 (2d Cir.1968) (granting plaintiff, manufacture of "SPEIDEL" watch bands an injunction against defendant's use of trade names "SPI–DELL" and "SPEI–DELL" to designate its watch bands).

Finally, a defendant has engaged in conduct with a predatory intent when he knowingly takes "unfair advantage of the business values developed by plaintiff...." *Ferrara v. Scharf*, 466 F.Supp. 125, 134 (S.D.N.Y.1979). Defendants' print advertisements for the "Mc (stuffed) Bagel," as well as the statement by defendants' attorney that McBagel's wished to capitalize on the press attention generated by the McDonald's policing action, establish defendants' attempt to take unfair advantage of plaintiff in the instant case.

Accordingly, plaintiff has proven that defendants' mark "McBAGEL'S" results in impermissible dilution under New York state law.

## IV. SCOPE OF RELIEF

The Court concludes that the plaintiff has established its right to injunctive relief on each of the theories advanced. The Court now turns to the scope of such relief.

The defendants argue that since defendant McShea at all times acted as an officer of the corporate defendant, he should not be held individually liable. The Court disagrees. The Court has found McShea to have personally acted in bad faith and he is the sole proprietor of the corporate defendant. An injunction limited solely to the corporate entity would be ineffective; McShea could easily circumvent it by incorporating anew and continuing his infringing ways.

In crafting an appropriate order to enforce McDonald's rights, the Court must limit the injunction to one that goes no further than the protection of McDonald's lawful trademark rights. The Court takes into consideration the fact that defendant McShea's name begins with the "Mc" prefix and recognizes that he might wish the restaurant to somehow reflect his name.

The Second Circuit Court of Appeals has demonstrated a concern for defendants whose use of their own name infringed upon the legitimate rights of a prior user. In *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62 (2d Cir.1985), a junior user of the "Scott" name, a member of the Scott family, had infringed upon the prior user's trademark. The court determined that the junior user could no longer use the name "Scott" standing alone. The Court, however, decided that if the junior user made it clear that his company had no association with the first user then he could use his name to describe past accomplishments under that name. The Court concluded that the ultimate aim of injunctive relief in a case involving competing uses of a family name is "to frame an injunction that will avoid confusion in the marketplace, protect a prior company's property interest in its name, and permit an individual to exploit his own identity and reputation in a legitimate manner." *Id.* at 66–67. Although this case differs from the situation in *Joseph Scott*, since McShea did not use his name in its entirety, but only the "Mc" portion of it, the Court is still guided by the injunctive principles set forth in that case.

In framing appropriate injunctive relief, the Court thus looks to McDonald's interests in its "Mc" mark and to defendant McShea's interest in the "Mc" part of his

**1282**

name. The Court concludes that Mc-Donald's will be fully protected by prohibiting any use by the defendants of "Mc" solely in combination with a generic food item. This result will encompass the scope of McDonald's rights, while allowing defendant McShea to make a reasonable use of his name, including the name selected in his consumer competition: "McSheagels".

Although this Court finds that defendants have infringed plaintiff's trademark rights, this Court cannot conclude that McDonald's has a boundless monopoly on the "Mc" formative. McDonald's itself has acknowledged that had the defendants changed the name of their restaurant to "McSheagel's," this lawsuit would not have been necessary. The Court, however, recognizes that McDonald's has expended considerable effort and resources to create a public identification between its "Mc" family of marks and the goods and services it offers. The evidence presented in this case, discussed at length above, demonstrates that plaintiff has succeeded in this goal. Yet, this does not entitle McDonald's to rights that bear no relationship to the manner in which it has used the prefix "Mc" to promote its business.

McDonald's has used the "Mc" mark primarily to expand the food services it offers to consumers by presenting the "Mc" phrase in some combination with a generic food item. For instance, the phrase "McVEAL," which like the name "McBA-GEL'S" uses the "Mc" formative with a generic food name, would tend to evoke visions of the Golden Arches in the mind of the unsuspecting consumer. Although one can imagine more difficult examples involving the outer boundaries of plaintiff's trademark rights, resolution of such problems are not raised in the instant case. In this case, it is sufficient for the Court to conclude that plaintiff has established the legal right to exclusive use of the "Mc" formative with a generic food item, and defendant's name "McBAGEL'S" violates this right.

## CONCLUSION

Accordingly, McBagel's is enjoined from using the specific name "McBAGEL'S" and any other name utilizing the phrase "Mc" in any combination with a generic food item. The parties are hereby ordered to submit an appropriate order for an injunction consistent with the Court's decision within five days from the date of this opinion.

SO ORDERED.