THIS DISPOSITION IS
CITABLE AS PRECEDENT
OF THE TTAB

Mailed:
February 9, 2006
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Starbucks U.S. Brands, LLC and Starbucks Corporation
d.b.a. Starbucks Coffee Company

v.

Marshall S. Ruben
_____

Opposition No. 91156879
against Serial No. 78120060
_____

Julia Anne Matheson and Linda K. McLeod of Finnegan
Henderson Farabow Garrett & Dunner, L.L.P. for
Starbucks U.S. Brands, LLC and Starbucks Corporation
d.b.a. Starbucks Coffee Company.

Edward A. Pennington and Robert R. Seabold of Swidler
Berlin Shereff Friedman, LLP for Marshall S. Ruben.
_____

Before Walters, Bucher and Zervas, Administrative
Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

Marshall S. Ruben (hereinafter "Mr. Ruben," "Ruben"

or "applicant") seeks registration on the Principal

Register of the mark **LESSBUCKS COFFEE** *(standard character*

*drawing)* to be used in connection with goods and services

recited as amended, as:

> "coffee, tea, and coffee-based and tea-based beverages" in International Class 30; and
>
> "retail store services featuring coffee, tea, coffee-based beverages, and tea-based beverages" in International Class 35.[1]

Registration has been opposed by Starbucks Corporation d.b.a. Starbucks Coffee Company and its subsidiary, Starbucks U.S. Brands, LLC (hereinafter, collectively referred to as "Starbucks" or "opposers"). As their grounds for opposition, opposers assert that applicant's mark when used in connection with applicant's goods and services so resembles opposers' previously used and registered marks, **STARBUCKS** and **STARBUCKS COFFEE** for coffee, tea, coffee-based and tea-based beverages as well as retail store services featuring such goods, as to be likely to cause confusion, to cause mistake or to deceive under Section 2(d) of the Lanham Act; that Ruben's **LESSBUCKS** mark is likely to dilute the distinctive quality of the **STARBUCKS** mark under Section 43(c), 15 U.S.C. § 1125(c), alleging that their **STARBUCKS** mark became famous prior to applicant's filing date; as well as

---

[1] Application Serial No. 78120060 was filed on April 7, 2002 based upon applicant's allegation of a *bona fide* intention to use the mark in commerce. Applicant has disclaimed the word COFFEE apart from the mark as shown.

alleging that Ruben lacks the requisite *bona fide* intent to use his mark in commerce on or in connection with the goods and services listed in the application, as required under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).[2]

Applicant, in his answer, has denied the salient allegations in the opposition. The parties have fully briefed this case and neither party requested an oral hearing.

## The Record

By operation of the rules, the record includes the pleadings and the file of the opposed application. Starbucks U.S. Brands, LLC, a wholly-owned subsidiary of Starbucks Corporation, has made of record opposers' pleaded registrations[3] by submitting certified status and

---

[2]  Opposers also alleged in Count III of Starbucks' Amended Notice of Opposition that Ruben's application is void *ab initio* as Ruben was neither the owner of the mark nor solely entitled to use the mark at the time he signed the verified statement in support of the application and at the time he filed the application before the United States Patent and Trademark Office. This ground for opposition was based upon the allegation that the LESSBUCKS mark was conceived and developed by both Mr. Ruben and Herbert H. Haft, as joint owners of the mark – a separate set of factual circumstances from the claim of a lack of *bona fide* intention to use the mark in commerce. Opposers subsequently withdrew this grounds for opposition.
[3]  Record ownership of more than fifty STARBUCKS registrations is in the name of opposer Starbucks U.S. Brands, LLC, and opposer Starbucks Corporation (dba Starbucks Coffee

title copies of the following registrations for the various STARBUCKS marks:



For "coffee, tea, spices and cocoa" in International Class 30;[4]



for "coffee, tea, spices, herb tea, chocolate, and cocoa" in International Class 30; and "coffee bar services, and coffee distribution services, and retail store services" in International Class 42[5]

**STARBUCKS**
*(standard character drawing)*

for "coffee, tea, spices, herb tea, chocolate, and cocoa" in International Class 30;[6]

---

Company) uses the STARBUCKS marks under license.  *See* Not. of Rel. 9, SEC 10-K 2003, p. 15; Chapman Dep. at 10-13, Exh. 16.

[4]     Reg. No. 1098925 issued on August 8, 1978 based upon applicant's claim of use anywhere and use in commerce since at least as early as March 29, 1971.  Section 8 affidavit accepted and Section 15 affidavit acknowledged; renewed.  Registrant disclaims the words COFFEE, TEA and SPICES apart from the mark as shown.

[5]     Reg. No. 1417602 issued on November 18, 1986 based upon applicant's claim of use anywhere and use in commerce since at least as early as March 29, 1971.  Section 8 affidavit accepted and Section 15 affidavit acknowledged.

[6]     Reg. No. 1452359 issued on August 11, 1987 based upon applicant's claim of use anywhere and use in commerce since at least as early as March 29, 1971.  Section 8 affidavit accepted and Section 15 affidavit acknowledged.


for "coffee" in International Class 30; and "restaurant services featuring coffee and espresso beverages and also serving sandwiches and breakfasts" in International Class 42;[7]


for "hand operated coffee grinders and coffee mills, non electric coffee makers, insulated cups, reusable non paper coffee filters, beverage stowaways (cup holders for use on car and boat dashboards), non paper coasters, thermal insulated bottles, and housewares; namely, coffee cups, non electric coffee pots not of precious metal, cups, mugs, dishes, trivets, and canisters" in International Class 21; "ground and whole bean coffee, cocoa, tea, powdered chocolate and powdered vanilla, muffins, pastries, cookies, breads, granola, and candy; namely, chocolates, chocolate covered coffee beans, chocolate covered cherries, and chocolate covered almonds" in International Class 30; and "retail store services featuring of all of the above goods as well as decorative magnets, paper coffee filters, and electric appliances; namely, power operated coffee grinders, espresso makers, coffee makers, percolators, and coffee pots; distributorship services of all the foregoing goods; restaurant and cafe services" in International Class 42;[8]

---

[7] Reg. No. 1542775 issued on June 6, 1989 based upon applicant's claim of use anywhere and use in commerce since at least as early as October 23, 1987. Section 8 affidavit accepted and Section 15 affidavit acknowledged. Registrant disclaims the word COFFEE apart from the mark as shown.

[8] Reg. No. 1815937 issued on January 11, 1994 based upon applicant's allegations of first use date ranging from August to October of 1992. Section 8 affidavit accepted and Section 15 affidavit acknowledged; renewed. Registrant disclaims the word COFFEE apart from the mark as shown. The mark is lined to

| | |
|---|---|
|  | for "flavoring syrups for beverages" in International Class 30;[9] |
| **STARBUCKS**<br><br>*(standard character drawing)* | for "ready-to-drink coffee, ready-to-drink coffee-based beverages, in International Class 30; and "coffee flavored soft drinks and syrups and extracts for making flavored soft drinks and milk-based beverages" in International Class 32;[10] |
|  | for "ready-to-drink coffee, ready-to-drink coffee-based beverages" in International Class 30; and "coffee-flavored soft drink, flavored soft drinks and syrups and extracts for making the foregoing" in International Class 32;[11] |
| STARBUCKS COFFEE | for [wholesale distributorships, retail outlets and mail order services featuring] ground and whole bean coffee; tea; cocoa; coffee and espresso beverages and beverages made with a base of coffee, espresso, and/or milk; |

indicate the color green, and color is claimed as a feature of the mark. *See also* Reg. No. 1815938 (similar to Reg. No. 1815937 except that color is *not* claimed as a feature of the mark in this second registration).

[9] Reg. No. 1943361 issued on December 26, 1995 based upon applicant's claim of use anywhere and use in commerce since at least as early as April 30, 1993. Section 8 affidavit accepted and Section 15 affidavit acknowledged; renewed. Registrant disclaims the word COFFEE apart from the mark as shown.

[10] Reg. No. 2086615 issued on August 5, 1997 based upon applicant's claim of use anywhere and use in commerce since at least as early as May 20, 1996 in International Class 30 and July 31, 1995 in International Class 32. Section 8 affidavit accepted and Section 15 affidavit acknowledged.

[11] Reg. No. 2120653 issued on December 9, 1997 based upon applicant's claim of use anywhere and use in commerce since at least as early as July 31, 1995. Section 8 affidavit accepted and Section 15 affidavit acknowledged. Registrant disclaims the word COFFEE apart from the mark as shown.

powdered flavorings; flavoring syrups; baked goods, including muffins, scones, biscuits, cookies, [pastries, cakes and breads, and ready-to-make mixes of the same]; packaged foods; sandwiches and prepared foods; chocolate and confectionery items; [ready-to-eat cereals]; dried fruits, [spreads]; juices; soft drinks; electric appliances, namely, kettles, coffee makers, espresso makers and coffee grinders; housewares, [non-electric appliances and related items, namely, hand-operated coffee grinders and coffee mills], insulated coffee and beverage cups, [collapsible cup carriers and caddies], non-paper coasters, insulated vacuum bottles, coffee cups, tea cups and mugs, glassware, dishes, plates and bowls, trivets, storage canisters, non-electric drip coffee makers and non-electric plunger-style coffee makers; paper and non-paper coffee filters; furniture; watches; clocks; toys; books; musical recordings; [T-shirts, caps, sweatshirts, jackets, aprons and other clothing items]" in International Class 35;[12]



For "ground and whole bean coffee; cocoa; herbal and non-herbal teas; coffee, tea, cocoa and espresso beverages, and beverages made with a base of coffee and/or espresso, instant coffee; ready-to-drink coffee beverages; liquid and

---

[12] Reg. No. 2227835 issued on March 2, 1999 based upon applicant's claim of use anywhere and use in commerce since at least as early as August 31, 1991. Section 8 affidavit accepted and Section 15 affidavit acknowledged. Registrant disclaims the word COFFEE apart from the mark as shown. Opposer is advised that the electronic database of the USPTO, like the status and title copies of the registration submitted by opposers, includes, within deletion brackets in the recitation of these International Class 35 services, wording that is seemingly critical to the recitation of services.

powdered beverage mixes; powdered flavorings; flavoring syrups for beverages; baked goods, namely, muffins, scones, biscuits, cookies, pastries and breads; ice cream and frozen confections; chocolate; candy and confections and ready-to-eat cereals" in International Class 30;[13] and



for "wholesale distributorships, retail outlets and mail order services featuring ground and whole bean coffee; tea; cocoa; coffee and espresso beverages and beverages made with a base of coffee, espresso, and/or milk; powdered milk; powdered flavorings; flavoring syrups; baked goods, including muffins, scones, biscuits, cookies, pastries, cakes and breads, and ready-to-make mixes of the same; packaged foods; sandwiches and prepared foods; chocolate and confectionery items; ready-to-eat cereals; dried fruits, spreads; juices; soft drinks; electric appliances, namely, kettles, coffee makers, espresso makers and coffee grinders; housewares, non-electric appliances and related items, namely, hand-operated coffee grinders and coffee mills, insulated coffee and beverage cups, collapsible cup carriers and candies, non-paper coasters, insulated vacuum bottles, coffee cups, tea cups, mugs, glassware, dishes, plates and bowls, trivets, storage canisters, non-electric drip coffee makers and non-electric plunger-style coffee makers; paper and non-paper coffee filters; furniture; watches; clocks; toys; books;

---

[13] Reg. No. 2266351 issued on August 3, 1999 based upon applicant's claim of use anywhere and use in commerce since at least as early as October 20, 1992. Section 8 affidavit accepted and Section 15 affidavit acknowledged. Registrant disclaims the word COFFEE apart from the mark as shown.

> musical recordings; T-shirts, caps, sweatshirts, jackets, aprons and other clothing items" in International Class 35.[14]

Starbucks has also made the deposition testimony of the following witnesses of record: Colleen Chapman, Director, Brand Management, for Starbucks Coffee Company, and Exhibit Nos. 1 - 39; Ann Breese, Director, Research for the Marketing Research Department, for Starbucks Coffee Company, and Exhibit Nos. 40 & 41; Robert N. Reitter, President of Guideline Associates, and Exhibits A and B; and Marshall S. Ruben, Applicant, and Exhibit Nos. 1 - 15.[15]

The record also includes opposers' nine separate notices of reliance filed during their testimony period, as follows:

> 1. Notice of Reliance No. 1, dated August 11, 2004, containing certified status and title copies of thirteen of Starbucks' valid and subsisting pleaded U.S. trademark registrations for the STARBUCKS and STARBUCKS COFFEE marks, as set forth above.

---

[14] Reg. No. 2325182 issued on March 7, 2000 based upon applicant's claim of use anywhere and use in commerce since at least as early as October 20, 1992. Registrant disclaims the word COFFEE apart from the mark as shown.
[15] The deposition testimony of Marshall S. Ruben taken during Starbucks' testimony period is designated "Ruben I Dep. at ___, Exh.___."

2. Notice of Reliance No. 2, dated October 22, 2004, consisting of printed publications available to the general public.

3. Notice of Reliance No. 3, dated October 22, 2004, consisting of printed publications available to the general public.

4. Notice of Reliance No. 4, dated October 22, 2004, consisting of transcripts of television and radio programs broadcast to the general public on national television networks and radio stations and taken from the NEXIS database.

5. Notice of Reliance No. 5, dated November 4, 2004, consisting of Ruben's Responses to Starbucks' First Set of Interrogatory Nos. 1-5, 11-14, and 16-17.

6. Notice of Reliance No. 6, dated November 4, 2004, consisting of Ruben's Supplemental Responses to Starbucks' First Set of Requests for Admission Nos. 1-10, 12-27, and 51-53.

7. Notice of Reliance No. 7, dated November 10, 2004, consisting of Ruben's Responses to Starbucks' First Set of Requests for Admission No. 1.

8. Notice of Reliance No. 8, dated November 10, 2004, consisting of civil action complaints filed by Starbucks against third parties based upon the STARBUCKS and STARBUCKS COFFEE marks.

9. Notice of Reliance No. 9, dated November 19, 2004, consisting of certified copies of Starbucks' 10-K forms and exhibits as filed before the Securities and Exchange Commission ("SEC").[16]

---

[16] On November 18, 2004, Starbucks filed a timely motion to extend their testimony period for the limited purpose of submitting Notice of Reliance No. 9, containing certified copies of Starbucks' SEC 10-K filings. These forms filed with the SEC are official records consistent with Rule 2.122(e). We grant Starbucks' motion to extend as conceded under Trademark Rule 2.127(a), and for good cause shown under Fed. R. Civ. P. 6(b).

Applicant, Marshall S. Ruben, has made of record his own deposition testimony taken during his testimony period, along with applicant's Exhibit Nos. 42 - 45.[17]

## *Procedural Matters*

Before turning to the record and the merits of this case, we must discuss several preliminary matters.

The relevant deposition transcripts show that Ruben's counsel objected to many of the documents introduced at each testimonial deposition taken by Starbucks. Applicant renewed his objections in his brief, asserting only that "all documents relied on by Starbucks Co. are objected to since they were not produced during the discovery phase of the proceeding,"[18] and therefore all references to the documents should be stricken, and opposers should not be allowed to rely upon those documents.

We find that Ruben's sweeping allegations are insufficient to preserve the individual objections originally made at the time opposers' various depositions were taken. Applicant's brief fails to identify the specific documents that he claims should be stricken from

---

[17]   This second deposition of Marshall S. Ruben taken during Ruben's testimony period is designated "Ruben II Dep. at ___, Exh. __."

the record or the discovery requests to which such documents were allegedly responsive.  The Board will not cull through each deposition and exhibit in order to identify each separate objection.  Accordingly, we summarily deny applicant's objections to the documents introduced during the testimonial depositions taken by Starbucks.

To the extent that applicant's objection to all of opposers' documents on the ground that such documents were not properly disclosed during discovery may be considered a separate objection, it is not well taken.  Starbucks produced 4,500 pages of documents on January 27, 2004, well before the close of the discovery period.  Starbucks' initial discovery objections were followed with multiple submissions of additional documents and disclosures.[19]  As to any prejudice claimed by applicant, we note that all of Starbucks' extensive production took place well in advance of opposers' testimony deposition of Colleen Chapman, when many of these documents were introduced.

---

[18]    Applicant's brief, pp. 2, 23.

[19]    To the extent that applicant takes the position that all of Starbucks' discovery responses should have been produced by the closing date of the discovery period, this is clearly not the rule. *See Nobell.com LLC v. Qwest Communications International Inc.*, 66 USPQ2d 1300, 1303 n. 6 (TTAB 2003).

Additionally, applicant has objected specifically to Starbucks' tardy production of copies of civil action complaints relating to the STARBUCKS mark, which were submitted by Starbucks on November 10, 2004 under Notice of Reliance No. 8. Ruben argues that Starbucks shirked their discovery obligations by failing to produce this information during discovery. Ruben asserts that he only became aware of the civil action complaints in November 2004 with Starbucks' November 10, 2004 submission of copies of these complaints with their Notice of Reliance No. 8, and hence, that he "did not have the opportunity to investigate the complaints."

We find Ruben's claims that he was unaware of Starbucks' civil action complaints until November 2004 to be disingenuous. Starbucks complied with Board procedures (See TBMP § 419(10) (2d ed. Rev. 2004)) as it relates to applicant's Interrogatory No. 13 and Request for Documents No. 14 seeking identification and production of any documents, including complaints, relating to any challenge by opposer(s) to any third party's use of a mark that opposer(s) considered to conflict with any of Starbucks' marks by timely identifying the parties, the jurisdiction, and the proceeding number for all outstanding enforcement

matters in their January 27, 2004 written discovery responses – more than nine months before Starbucks' testimony deposition. Accordingly, we overrule applicant's objections to the introduction of copies of Starbucks' civil action complaints.

Applicant also argues that Starbucks' survey evidence should be stricken because Mr. Reitter, opposers' survey expert, was not identified during the discovery period. Ruben, in his brief, does not identify a specific discovery request asking for the identity of experts. See TBMP § 419(7) (2d ed. Rev. 2004). In any event, the record shows that Starbucks did not retain Mr. Reitter until after the close of the discovery period, and decided to introduce Mr. Reitter's testimony and report into evidence in July 2004. Starbucks properly notified Rubens of Reitter's deposition. As to the survey results, as discussed above with regard to other documentation, we find that opposers complied with all their obligations to produce for applicant survey results as soon as they became available.[20]

---

[20] Specifically, Mr. Reitter had survey interviews conducted between May 27 and June 1, 2004. On July 1, 2004, as soon as any feedback was available to Starbucks – and hoping that the results might encourage a settlement – opposers notified

Starbucks has objected to several printouts of excerpts apparently taken from Internet websites that Ruben sought to introduce during his testimony deposition. These excerpts contain criticisms of Starbucks and/or the price of goods sold by Starbucks. During Ruben's deposition, Starbucks' counsel objected to this evidence as inadmissible hearsay that was not properly authenticated by the person with first-hand knowledge who searched for and downloaded the information. In fact, on cross examination, Mr. Ruben admitted that these

---

applicant of the preliminary results of the survey. Mr. Reitter's preliminary report was almost identical to the final report served on August 13, 2004. On July 30, 2004, with more than two weeks notice, Starbucks noticed Mr. Reitter's testimony deposition for August 16, 2004 – the last day of Starbucks' thirty-day testimony period as plaintiffs. On August 9, 2004, Mr. Reitter completed the final survey interviews, using the identical questionnaire, study design, relevant universe of interest, sampling plan, field instructions, and interviewing and verification procedures identified in his July 1, 2004 report. On August 12, 2004, Mr. Reitter completed his final survey report, and sent a copy to Starbucks' counsel on August 13, 2004. On the same date, opposers hand-delivered a copy of that final report to Mr. Ruben's counsel. Hence, we find that Mr. Ruben had notice of Starbucks' intention to introduce Mr. Reitter's testimony and report as soon as those reports were available to Starbucks and as soon as Starbucks made the decision to use Mr. Reitter as a trial expert. Should applicant have wanted to construct his own survey, or to engage an expert to critique or rebut Starbucks' survey, he had sufficient time leading up to his testimony period. Additionally, in the event Mr. Ruben's counsel needed additional time to review the final survey report in advance of Mr. Reitter's deposition, he could have contacted Starbucks' counsel to reschedule this deposition. There is no indication that Mr. Ruben's counsel requested this, let alone any indication that opposers were not amenable to it.

particular searches were conducted, and the search results printed out, by someone in his counsel's office.  While he allegedly conducted a similar search himself, he was not aware of the parameters of the search associated with the web pages submitted during his testimony, and was not able to name the individual who conducted the Internet search.  Accordingly, this evidence has not been properly authenticated, and we have given it no consideration.  *See Raccioppi v. Apogee, Inc.*, 47 USPQ2d 1368 (TTAB 1998).

Finally, opposers move under Trademark Rule 2.123(1) and TBMP § 539 (2d ed. Rev. 2004), to strike the exhibits attached to Ruben's trial brief, as this evidence was not made of record during his testimony period.  TBMP 704.05 (b) (2d ed. Rev. 2004).  The evidence includes excerpts from the novel, Moby Dick.  Although we can take judicial notice that the novel itself is a classic, we cannot take judicial notice of the contents of the novel.  We agree with opposers that all of this evidence must be excluded as untimely and therefore grant opposers' motion to strike.  The exhibits attached to Ruben's trial brief have been given no consideration.

*Factual Findings*

Starbucks opened their first retail store in Pike Place Market in Seattle, Washington in 1971.  Starbucks has grown to well over 5,000 company-owned and licensed stores throughout the United States, making Starbucks one of the largest and best-known vendors of coffee products in the United States.  Tens of millions of customers are exposed to the STARBUCKS mark every day.  In the three-year period of 2001 to 2004, Starbucks spent more than $150 million marketing their STARBUCKS and STARBUCKS COFFEE marks.  These activities included television and radio commercials, print advertisements, in-store displays, brochures, billboards, banners, catalogs and signage.  In determining when and where to place advertisements bearing the STARBUCKS mark, opposers specifically target media and locations with the highest visibility, consumer traffic, circulation, and market penetration.  Starbucks also operates an Internet website that generates an average of 350,000 hits from visitors each week.

In the three-year period of 2001 to 2004, Starbucks had sales of more than $10 billion.  In 2004 alone, Starbucks' sales revenues reached $4 billion.  Consumers

can find STARBUCKS coffee served and/or sold in tens of thousands of grocery stores, hotels, bookstores, airports, restaurants, hospitals, universities and convention centers nationwide.  Starbucks has attracted a remarkable volume of unsolicited media attention from national television and radio programs, news wire reports, and the print press.

Starbucks' retail stores are typically located in high-traffic, high-visibility locations.  Starbucks' stores conduct more than eleven million customer transactions per week.  As of 2004, nearly half of all consumers in the United States had visited a Starbucks' location — up from 88 million visitors comprising 42% of the total U.S. population in 2002.

In addition to their company-owned retail stores, Starbucks has for many years been engaged in licensing arrangements, foodservice accounts, and other initiatives for their products to reach customers wherever they work, travel, shop or dine.  Starbucks has license agreements to operate Starbucks locations within major U.S. grocery stores, such as Safeway, Albertsons, Fred Meyer and Kroger.  STARBUCKS coffee is served from thousands of dedicated areas in Hyatt Hotels, Marriott Hotels, Starwood

Hotels, Westin Hotels, various cruise lines, Barnes & Noble Bookstores, hospitals, universities and convention centers. Starbucks has licensed Host Marriot Services Corporation to operate more than 150 kiosks in major U.S. airports. As with Starbucks' company-owned stores, each of these locations prominently displays the STARBUCKS mark on exterior signage, menus, cups, and in multiple spots within each location. Starbucks markets and distributes whole bean and ground coffee under the STARBUCKS mark through a licensing agreement with Kraft Foods, Inc., reaching into 19,500 grocery store and warehouse club accounts throughout the United States. Starbucks sells whole bean and ground coffee bearing the STARBUCKS mark to institutional foodservice companies servicing more than 12,800 businesses, educational institutions, healthcare centers, office distributors, hotels, restaurants, airlines, and other retailers. Through an agreement with the Pepsi-Cola Company, Starbucks also distributes several exclusive coffee beverages – including bottled STARBUCKS DOUBLESHOT coffee drinks – at grocery stores, convenience stores, and similar retailers nationwide. Each of these products prominently bears the STARBUCKS mark.

Starbucks also has engaged in co-branding and strategic partnership marketing with firms such as Hewlett-Packard ("HP"), T-Mobile, BankOne Corporation and VISA. Starbucks supports the Sundance Film Festival, which displays the STARBUCKS mark in advertising and promoting its independent film festival.

Not surprisingly, Starbucks' investment in advertising and promoting their STARBUCKS mark, and their corresponding growth and achievements, have attracted intense unsolicited media attention. Starbucks' coffee products and stores have been featured in numerous national television and radio programs and press articles.

Applicant, Marshall S. Ruben, is an entrepreneur with experience in shopping center development and leasing. He grew up learning the retail business as a result of his family's ownership of the Washington DC based Steven-Windsor Men's Shops. He learned about discount retailing from the late Herbert Haft, well known in the Washington DC area for, *inter alia*, founding Trak Auto, Shoppers Food Warehouse, and Crown Books, according to Mr. Ruben's testimony. Ruben filed the involved intent-to-use application seeking registration of the mark LESSBUCKS COFFEE for coffee, tea, and coffee-based and tea-based

beverages, and retail store services featuring coffee, tea, coffee-based beverages, and tea-based beverages. He testified that he intends to use the LESSBUCKS mark in connection with a nationwide chain of "discount" coffee stores. A year after filing the involved trademark application, Mr. Ruben entered into a written licensing agreement with another entity that he stated he formed with Mr. Haft as one of many possible ways he envisioned following through on his intention of opening a chain of discount coffee stores to sell coffee, tea, and related products to members of the general public under the LESSBUCKS mark.

However, aside from his subjective intentions and a license agreement with a company he co-founded with Mr. Haft,[21] Ruben has taken no steps to commercialize his ideas, and has failed to produce any other documentary evidence demonstrating his intent to use the LESSBUCKS mark in connection with the identified goods and services. In response to Starbucks' interrogatories, Ruben stated that the application filing "speaks for itself …."[22] On

---

[21] The record contains no evidence that this company ever conducted any activity in connection with the license agreement.
[22] Opposers' Interrogatory No. 16, asked Ruben to "state all facts that support Applicant's *bona fide* intent to use

more than one occasion, Ruben testified that he has no written business or marketing plans and has not held any business meetings regarding the LESSBUCKS mark[23]; that he has made no effort to contact suppliers[24]; that he has not designed any product packaging, signs or labels, has done no hiring of personnel[25]; and that he has neither investigated distributors nor identified any possible retail locations.[26]

## *Starbucks Has Standing*

First, we note that with regard to the threshold inquiry of Starbucks' standing in this opposition proceeding, opposers have alleged and proven at trial a real commercial interest in the STARBUCKS and STARBUCKS COFFEE marks, as well as a reasonable basis for the belief that opposers would be damaged by the registration of

---

Applicant's Mark in commerce as to each of the products and services set forth in Application Serial No. 78/120060." Ruben responded that his "application speaks for itself as to his *bona fide* intent to use Applicant's Mark in commerce." (Applicant's Objections and Responses to Opposers' First Set of Interrogatories at No. 16.)

[23] Ruben I Dep. at 35, line 12 to 37, line 6.

[24] Ruben I Dep. at 40, starting at line 24; and Ruben I Dep. at 46, lines 4 – 6.

[25] Ruben I Dep. at 38, lines 1 – 13; and Ruben I Dep. at 46, lines 7 – 18.

[26] Ruben I Dep. at 38, lines 16 – 21; and Ruben I Dep. at 40, starting at line 12.

applicant's LESSBUCKS mark. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025-26 (Fed. Cir. 1999). Starbucks U.S. Brands, LLC, as a wholly-owned subsidiary of Starbucks Corporation, has presented evidence of its ownership of prior issued registrations for the various STARBUCKS marks, as well as Starbucks' prior use of the STARBUCKS marks in connection with services and goods identical to those listed in Ruben's application. Given that Starbucks U.S. Brands, LLC, is a wholly-owned subsidiary of Starbucks Corporation, we conclude that both opposers have standing. We find that opposers have clearly demonstrated that they would be in competition with applicant in the sale of coffee, tea, and coffee-based and tea-based beverages and retail store services featuring coffee, tea, coffee-based beverages, and tea-based beverages.

## *Priority*

We turn then to the issue of priority in relation to the goods and services set forth in opposers' pleaded registrations. As noted above, Starbucks U.S. Brands, LLC, has established its ownership of valid and subsisting registrations for the various STARBUCKS marks. Therefore,

there is no issue as to opposers' priority. *See King Candy Company v. Eunice King's Kitchen, Inc*., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); and *Carl Karcher Enterprises Inc. v. Stars Restaurants Corp*., 35 USPQ2d 1125 (TTAB 1995). Moreover, voluminous evidence in the record shows that opposers have used the various STARBUCKS marks since prior to the filing date of applicant's application, which in the absence of other evidence, is the earliest date on which applicant can rely.

## Likelihood of Confusion

We turn, then, to the issue of likelihood of confusion. Our determination of likelihood of confusion is based upon our analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *See In re E. I. du Pont de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

### Fame

As to the strength of opposers' STARBUCKS mark, the record shows that opposers have been aggressive in taking steps to protect their STARBUCKS mark. Except for several third-party marks that opposers have commenced enforcement

actions against, there is no evidence in the record of any third-party use of similar marks for related goods and services. Accordingly, the STARBUCKS and STARBUCKS COFFEE marks are strong and entitled to a broad scope of protection.

More significantly, for our purposes, the *du Pont* factor focusing on the fame of the prior mark plays a dominant role in the process of balancing the *du Pont* factors in cases featuring a famous or strong mark. *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992); *see also Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005); *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); and *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000). As the fame of a mark increases, the degree of similarity between the marks necessary to support a conclusion of likely confusion declines. *Bose Corp.*, *supra* at 1309.

Moreover, the Federal Circuit has stated repeatedly that there is no excuse for even approaching the well-known trademark of a competitor inasmuch as "[a] strong

mark … casts a long shadow which competitors must avoid."
*Kenner* *Parker* *Toys* *Inc.*, *supra* at 1456.

Opposers have testified that in the year 2004, Starbucks' sales revenues reached $4 billion.  Ms. Chapman stated that total sales under the STARBUCKS mark for the three years of 2001 to 2004 exceeded $10 billion. Furthermore, in that same three-year period, Starbucks spent more than $150 million promoting their goods and services under the STARBUCKS and STARBUCKS COFFEE marks.

In fact, opposers have shown that industry, businesses, brand leaders, and the general public have recognized STARBUCKS as one of the most famous brands in the world.[27]  Applicant himself admitted that the STARBUCKS mark was well known to the general public and famous for coffee and retail store services featuring coffee prior to the filing date of his application.

As discussed above, STARBUCKS coffee products and stores have attracted intense unsolicited media attention from national television and radio programs and the press, which has resulted in extensive recognition and renown of

---

[27]    Opposers cite to INTERBRAND, an international branding consultancy firm, *Brandweek, Adweek, Business Week,* and an International Trademark Association treatise by Frederick W. Mostert, Famous and Well-Known Marks (2nd ed. 2004).

the STARBUCKS mark among the general public. *See e.g.,*

*Bose Corp.*, 63 USPQ2d at 1309 [extensive media coverage is

indicative of fame].

We agree with opposers that this evidence confirms

that the STARBUCKS mark is truly a famous mark. The

evidence in this case certainly exceeds the extensive

public recognition and renown found sufficient to

establish fame in other cases.[28]

In view of the above, we find that the *du Pont* factor

focusing on the fame of the mark weighs heavily in favor

of finding a likelihood of confusion herein.

---

[28] *See Bose Corp.,* 63 USPO2d at 1308 [ACOUSTIC WAVE mark famous based on seventeen years of use, annual sales over $50 million, annual advertising in excess of $5 million, and extensive media coverage]; *Nina Ricci, S.A.R.L. v. E.T.F. Enters., Inc.,* 889 F.2d 1070, 12 USPQ2d 1901, 1902 (Fed. Cir. 1989) [NINA RICCI famous for perfume, clothing and accessories based on $200 million in sales, over $37 million in advertising, and over 27 years of use]; *Kimberly-Clark Corp. v. H. Douglas Enter., Ltd.*, 774 F.2d 1144, 227 USPQ 541, 542 (Fed. Cir. 1985) [HUGGIES famous for diapers based on over $300 million in sales over nine years and $15 million in advertising in a single year]; *Specialty Brands Inc. v. Coffee Bean Distribs., Inc.,* 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984) [SPICE ISLANDS for teas, spices and seasonings famous based on use for 40 years, $25 million annual sales for spices, $12 million sales for tea between 1959 and 1981, and "several million" in advertising]; *Giant Food. Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 218 USPQ 390, 392-93 (Fed. Cir. 1983) [GIANT FOOD famous for supermarket services and food products based on sales over $1 billion in one year, "considerable amounts of money" in advertising, and 45 years use]; *Planters Nut & Chocolate Co. v. Crown Nut Co.,* 305 F.2d 916, 134 USPQ 504, 506 (CCPA 1962) [MR. PEANUT famous for nuts and nut products based upon $350 million in sales, $10 million in advertising, and over 10 years of use).

## Relatedness of the goods and services

We turn, next, to the relatedness of the goods and services as listed in the cited registrations and in the involved application. The Board must base its determination of whether there is a relationship between the goods and services of the parties on the basis of the goods and services identified in the respective application and registrations. *Octocom Systems, Inc. v. Houston Computer Services, Inc.,* 918 F.2d 937, 16 USPQ2d 1783, 1788 (Fed. Cir. 1990).

Applicant has recited "coffee, tea, and coffee-based and tea-based beverages" and "retail store services featuring coffee, tea, coffee-based beverages, and tea-based beverages." This is substantially identical to the dominant goods and services recited in opposers' asserted registrations. For example, as seen above, opposers' Reg. No. 1542775 for STARBUCKS COFFEE and design is for "coffee" and "restaurant services featuring coffee and espresso beverages …" Accordingly, for purposes of Section 2(d) of the Lanham Act, we find that applicant's goods and services are identical in part to opposers' goods and services.

## Channels of trade

Because the parties' respective application and registrations are unrestricted, and applicant's goods and services are identical to some of opposers' goods and services, we must presume that at such time as applicant were to use his mark on the identified goods and recited services, the parties' respective goods and services will be traveling through the same channels of trade to the same classes of consumers. *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 199 (Fed. Cir. 1983); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) ("[A]bsent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers."); and *Kangol Ltd. v. KangaRoos U.S.A.*, 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992).

Absent restrictions in any of the identifications of goods and recitations of services, Ruben's efforts to distinguish his intended channels of trade and/or classes of consumers must fail. *Hewlett-Packard Co.*, 62 USPQ2d at 1005. In any case, the record shows that the parties' channels of trade and class of consumers will be

identical. Although Ruben testified that he intends to offer a chain of "discount" coffee stores to "cost conscious" consumers, opposers' unrestricted recitations of services would encompass discount stores and, further, the evidence shows that in addition to their traditional retail channels, Starbucks also markets and sells their goods to members of the general public through discount warehouse club stores. Ruben himself presented evidence that consumers can purchase STARBUCKS brand whole beans, co-promoted under the STARBUCKS and KIRKLAND brands, at Costco discount warehouse clubs.

### Conditions under which and buyers to whom sales are made

As to the *du Pont* factor focusing on the conditions under which and buyers to whom sales are made, applicant argues that "[o]ne has to doubt whether an unsophisticated customer could even place an order in a Starbucks location." He argues that not unlike wine aficionados, fans of specialty coffees "place increased emphasis on quality beans, regional character and the skill of the roaster," and hence represent careful, sophisticated purchasers.

By contrast, Starbucks contends that the coffee and tea products at issue herein are relatively inexpensive and may be purchased by ordinary consumers at retail stores, grocery stores, and warehouse club stores. Ms. Colleen Chapman, Director of Brand Management for Starbucks, testified that Starbucks sells a cup of coffee for $1.40 in company-owned stores – falling within the same inexpensive price range in which Ruben intends to offer his coffee. Starbucks has produced evidence that consumers can find whole bean and ground STARBUCKS coffee at grocery stores, such as Safeway, Kroger and Albertsons. We find that the evidence of record shows conclusively that the products and services at issue are neither expensive nor complicated, and may be purchased on impulse by ordinary consumers. Moreover, there is nothing in this record to support applicant's position that coffee lovers are sophisticated in terms of a likelihood of confusion analysis. Rather, because retail coffee and tea beverages and coffee and tea itself are inexpensive products and may be purchased on impulse and without care, consumers devote limited attention to the purchase of such goods and services, and thus are more susceptible to confusion. *See Palm Bay Imports Inc.*, *supra* at 1695 (Fed. Cir. 2005);

- 31 -

*Recot, Inc*., *supra* at 1899; *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281, 1282 (Fed. Cir. 1984); and *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1407 (TTAB 1998).  S*ee also* 3 J Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 23:95 (4th Ed. 2005).

## Similarity of the marks

We turn next to the *du Pont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.  *See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, *supra*.

We note in discussing this factor, the Court of Appeals for the Federal Circuit has held that when marks appear on "virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992).

In this case, both marks – STARBUCKS COFFEE and LESSBUCKS COFFEE – consist of two words having a similar cadence.  Both STARBUCKS and LESSBUCKS contain nine

letters, two syllables, and end in the identical term, BUCKS.[29]  As applicant admitted during his testimony deposition, the LESSBUCKS COFFEE and STARBUCKS COFFEE marks "visually, when typed the same, they look like similar letters."  Ruben I Dep. at 77-78.

Moreover, it is on this point that we turn to Mr. Reitter's survey results.  Starbucks retained Mr. Reitter, a recognized expert in the field of marketing and market research.  Mr. Reitter designed a mall intercept survey involving interviews with two hundred respondents at shopping malls in eight geographically dispersed metropolitan areas.

Mr. Ruben challenges Starbucks' survey results by criticizing the survey's format.  He argues that several of the survey's key questions are leading – guiding respondents to think that another company might own or be associated with LESSBUCKS COFFEE.  However, we find that

---

[29]    The marks in opposers' various registrations having the greatest similarity to Ruben's mark would be STARBUCKS in standard character form (e.g., Reg. Nos. 1452359 and 2086615) and STARBUCKS COFFEE in block lettering(e.g., Reg. No. 2227835). Nonetheless, in all the other special form marks claimed by opposers, the words STARBUCKS and STARBUCKS COFFEE are the predominant items within the larger composites, or logos, and in each of these marks, there is still a strong similarity with Ruben's mark as to appearance, sound and overall commercial impression.

the survey questions are consistent with those accepted in our established precedent on trademark surveys.

This Board has had occasion to review the so-called *Ever-Ready*[30] survey format.  See *Carl Karcher Enterprises Inc. v. Stars Restaurants Corp.,* 35 USPQ2d 1125, 1132 (TTAB 1995); and *Miles Laboratories, Inc. v. Naturally Vitamin Supplements, Inc.,* 1 USPQ2d 1445 (TTAB 1986).  We agree with opposers that Questions 1a and 1b of Starbucks' survey[31] parallel the precise formats approved in *Ever-Ready* and *Carl Karcher*.

Next, we note that consistent with *Ever-Ready*, Starbucks' Question 2a[32] and Question 3a[33] were designed to

---

[30]   In *Union Carbide Corp. v. Ever-Ready. Inc*., 531 F.2d 366, 188 USPQ 623 (7th Cir. 1976), cert. denied, 191 USPQ 416 (1976), the plaintiff conducted a survey to determine whether there was a likelihood of confusion between defendant's EVER-READY lamps and plaintiff Union Carbide's EVEREADY batteries, flashlights and bulbs.  The survey asked:  "Who do you think puts out the lamp shown here?  [showing a picture of defendant's EVER-READY lamp and mark]," and "What makes you think so?"  *Id*. at 640.

[31]   (Question 1a):  "This is the name of a retail establishment that serves coffee, tea, and other beverages. Just from knowing this, have you formed an opinion about the name of a company that owns this retail establishment?"
  *[Respondents answering Question 1a "yes" were then asked:]*
   (Question 1b):  "What is the name of the company?"

[32]   (Question 2a):  "Do you think the company that owns this retail establishment is connected or affiliated with any other company?"
  *[Respondents answering Question 2a "yes" were then asked:]*
   (Question 2b):  "What other company?"

[33]   (Question 3a):  "Do you think the company that owns this retail establishment has authorization, permission or approval from another company to use this name?"

elicit responses concerning sponsorship, affiliation, permission and approval. While these types of questions were not expressly addressed in *Ever-Ready*, a leading commentator[34] suggests, and court opinions[35] have found, that affiliation and connection queries are appropriate in light of the specific language of the Lanham Act.

Additionally, all these survey questions contain the follow-up question: "What makes you think so?" The answers given to these follow-up questions persuade us that the respondents were not merely guessing.

Rather, given the way in which this survey format carefully follows the *Ever-Ready* likelihood of confusion survey format, we find that it is reliable and therefore of probative value on the issue of likelihood of confusion herein. Turning to the results of the survey, almost half

---

*[Respondents answering Question 3a "yes" were then asked:]*
(Question 3b): "From what other company?"

[34] *See e.g.,* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:175 (4th ed. 2004).

[35] See e.g., McDonald's Corp. v. McBagel's, Inc., 649 F.Supp. 1268, 1 USPQ2d 1761 (S.D.NY 1986); James Burrough Limited v. Sign of the Beefeater, Inc., 540 F.2d 266, 192 USPQ 555, 564 (7th Cir. 1976); National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F.Supp. 651, 215 USPQ 175, 181-83 (W.D.Wash. 1982); Pebble Beach Co. v. Tour 18 I. Ltd., 155 F.3d 526, 48 USPQ2d 1065, 1076-77 (5th Cir. 1998); Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 31 USPQ2d 1811, 1816 (7th Cir. 1994); and Anheuser-Busch. Inc. v. Balducci Publications, 28 F.3d 769, 31 USPQ2d 1296 (8th Cir. 1994).

of the ordinary consumer participants who encountered the term LESSBUCKS COFFEE believed that the products offered under the LESSBUCKS designation were in some way connected to STARBUCKS. When the interviewer asked what made them believe that there was a connection or association between LESSBUCKS COFFEE and STARBUCKS, substantially all of the respondents referred to the similarity of the marks.

As to the connotation of his mark, Mr. Ruben explains that when selecting a name for his discount coffee stores, he wanted a mark that would immediately convey a message to consumers that his products were "less" expensive (i.e., fewer "bucks") than products offered by high-end competitors. In this same vein, another name he considered was "Savebucks." We agree with applicant that one possible connotation of the word LESSBUCKS to consumers may well be as a term suggestive of less expensive products.

Although applicant makes much of the fact that opposers' "Starbucks" mark is drawn from a Herman Melville character in the novel Moby Dick,[36] this connotation or

---

[36] Chapman Testimonial Dep. at 98, lines 11 - 17; Pour Your Heart Into It: How Starbucks Built a Company One Cup at a Time by Howard Schultz (Hyperion 1997), pp. 32 - 33.

connection is not likely to be known to an appreciable number of Starbucks' tens of millions of consumers. Rather, we find that the majority of consumers would view the term STARBUCKS in opposers' marks as an arbitrary, or even coined, term. In any case, we find that the connotations of the parties' respective marks are different.

Nonetheless, after comparing the respective parties' marks in their entireties, despite any possible differences in meaning, we conclude that the marks are sufficiently similar as to appearance, sound and overall commercial impression, such that this *du Pont* factor weighs strongly in opposers' favor.

### Ruben's "Parody"

Applicant argues in his brief that LESSBUCKS is likely to be perceived as a parody of the STARBUCKS mark, and as such should be considered in our assessment of the *du Pont* factors. Because Ruben believes that Starbucks charges too much for their products, he argues that his mark will be perceived as a play on the word STARBUCKS that simply suggests applicant's products cost "less" than those of Starbucks or other competitors. Applicant argues

that because the joke will be obvious to prospective customers, customers are not likely to be confused as to source, sponsorship or approval, and hence, parody works to avoid likelihood of confusion in the present case. Applicant further argues that inasmuch as opposers promote STARBUCKS COFFEE as a "premium" brand of coffee and coffee services, the mark LESSBUCKS COFFEE comes across as a humorous parody of the STARBUCKS COFFEE brand, and the fame of the STARBUCKS brand diminishes any likelihood of confusion.

As opposers point out, however, applicant's parody argument fails on several counts.

First, Ruben's own testimony shows that he cannot make up his mind whether or not to advance a parody argument in this case. Ruben asserts "parody" as an "affirmative defense" in his original answer, but then his amended answer includes no such claim. When asked about parody during his testimony depositions, Ruben expressly testified that he did not select his LESSBUCKS mark to play off of the STARBUCKS mark. So on the one hand, he argues that he did not intend to evoke the famous STARBUCKS mark, but on the other hand, maintains that his

LESSBUCKS mark is a protected parody of the STARBUCKS mark.

Second, Ruben's proposed use is for a competing "chain" of retail stores. *See e.g.*, *Deere & Co. v. MTD Products. Inc.*, 41 F.3d 39, 32 USPQ2d 1936, 1940 (2nd Cir. 1994) [joking uses of trademarks are deserving of less protection when the object of the joke is the mark of a directly competing product].

Third, applicant argues that the obviousness of the joke, when combined with the fame of the STARBUCKS brand, diminishes any likelihood of confusion. However, the results of opposers' survey provide evidence to the contrary. *See Columbia Pictures Industries, Inc. v. Miller*, 211 USPQ 816, 820 (TTAB 1981). The high levels of confusion between the LESSBUCKS COFFEE and STARBUCKS marks reflected in Mr. Reitter' survey establish beyond any doubt that prospective purchasers of applicant's LESSBUCKS COFFEE goods and services are, in fact, likely to believe that both parties' goods and services come from the same source.

## Summary: Likelihood of Confusion

In conclusion, after weighing all the relevant *du Pont* factors, we find a likelihood of confusion herein. STARBUCKS is a distinctive, strong and famous mark; the respective goods and services herein are legally identical; the trade channels and classes of purchasers are therefore legally identical; the marks are similar as to appearance, sound and commercial impression; the goods and services are inexpensive and are sold to ordinary classes of consumers; purchasers are unlikely to exercise care in purchasing the identified goods and services; and parody is unavailing to applicant as an outright defense and, further, does not serve to distinguish the marks.

### Dilution and lack of a bona fide intention to use the mark

In view of our finding as to the likelihood of confusion claim, we need not reach the merits of opposers' dilution claim. *See American Paging Inc. v. American Mobilphone Inc.*, 13 USPQ2d 2036, 2039-2040 (TTAB 1989), *aff'd without opinion*, 17 USPQ2d 1726 (Fed. Cir. 1990). Similarly, we need not reach the merits of opposers' claims as to applicant's lack of a *bona fide* intention to use the mark in commerce.

*Decision*:  The opposition is sustained and registration to applicant is hereby refused.